**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**EMILY COHEN**, *as Next Friend for*
**A.C.**, *a minor,*

Plaintiff,

Case No.
HON.

v.

**INTERLOCHEN CENTER FOR THE ARTS**,
*a Michigan nonprofit corporation,*
**INTERLOCHEN ARTS GROUP**,
*a Michigan nonprofit corporation,*
*d/b/a Interlochen Arts Academy,*
**DAVID HELDRETH**,
**CAMILLE COLATOSTI**, AND
**KRISTINA NICHOLS**,

Defendants.

FLOOD LAW, PLLC
TODD F. FLOOD (P58555)
MICHAEL D. WEAVER (P43985)
*Attorneys for Plaintiff*
155 W. Congress St., Ste. 350
Detroit, MI 48226
PH: (248) 547-1032
tflood@floodlaw.com
mweaver@floodlaw.com

**PLAINTIFF'S COMPLAINT & JURY DEMAND**

There is a civil action among these parties arising out of the same transaction or occurrence as alleged in this Complaint, Case No. 1:25-cv-00400-PLM-SJB, which was filed in the United States District Court for the Western District of Michigan on April 11, 2025, and was dismissed in full and without prejudice by the Honorable Paul L. Maloney on September 26, 2025.

/s/ Todd F. Flood

NOW COMES Plaintiff, EMILY COHEN, *as Next Friend for* A.C., *a minor*, by and through counsel, TODD F. FLOOD and FLOOD LAW, PLLC, and for her Complaint against Defendants INTERLOCHEN CENTER FOR THE ARTS, *a Michigan nonprofit corporation,* INTERLOCHEN ARTS GROUP, *a Michigan nonprofit corporation*, *d/b/a Interlochen Arts Academy*, DAVID HELDRETH, CAMILLE COLATOSTI, and KRISTINA NICHOLS, states as follows:

## INTRODUCTION

Interlochen Center for the Arts (hereinafter, "Defendant ICA") publicly proclaims its commitment to "providing an environment that is safe, respectful, and enjoyable for all."[1] In practice, Defendant ICA does the opposite. Instead, it cultivates a campus culture that exposes minor children to an alarming and unreasonable risk of sexual assault and sexual harassment that dates back to the 1950s.[2] When minor students summon the courage to report abuse, Defendant ICA does not offer support, it offers retaliation. It conducts sham investigations, imposes arbitrary consequences, and threatens the students that Defendant ICA is obligated to protect. Rather than hold perpetrators accountable, it silences survivors. When silence fails, Defendant ICA retaliates with constructive expulsion or compulsory withdrawal of the victimized minor student.

A.C., a minor, experienced Defendant ICA's institutional failures firsthand. As a fourteen-year-old freshman student living away from home for the first time, she endured severe, pervasive, and offensive sexual assault(s) and harassment at the hands of her roommate, male suitemate, and Defendant ICA staff. Her assailants grew bolder as Defendant ICA's culture permitted it. In fact,

---

[1] https://web.archive.org/web/20240804044511/https://www.tfaforms.com/5054333#expand.

[2] On July 27, 2026, Interlochen Center for the Arts released the report titled, "Internal Investigation Report: External Investigation of Historical Abuse". The report covers sexual assault, abuse, misconduct from the 1950s to the 2010s. The conduct includes "inappropriate comments and violations of professional boundaries to egregious acts of sexual abuse or violence by adults employed by or affiliated with Interlochen." https://www.interlochen.org/about/historical-investigation

when A.C. bravely reported the assault(s) and harassment to Defendant ICA officials, the institution failed A.C. completely as Defendants, collectively, did not investigate, repeatedly denied or delayed requests for a room/roommate reassignment, and refused to discipline A.C.'s assailants. Instead of providing the most basic protective measures, Defendant ICA forced her to continue sharing a living space with the individuals who abused her. The situation became so untenable that A.C. was compelled to take refuge in a local hotel for weeks before Defendant ICA finally relented and permitted a room change.

Beyond the abuse in her dorm room, A.C. began experiencing sexual harassment from a teacher, Defendant David Heldreth. A.C. reported this to her mother, who promptly escalated the matter to Defendant ICA's Title IX Department investigative team, including but not limited to Defendant Camille Colatosti and Defendant Kristina Nichols. Within weeks of Plaintiff's report, Defendants retaliated by constructively expelling A.C., a straight A student with no prior disciplinary history.

Following her constructive expulsion, A.C. fell into serious depression. The trauma she sustained during her first months as a minor student at Defendant ICA was so profound that she was unable to attend a prestigious boarding school in Massachusetts due to PTSD. She is currently receiving treatment for the lasting effects of the abuse she suffered and the institutional failures that compounded it.

As such, Plaintiff Emily Cohen brings this action to redress the injuries her minor child A.C. sustained as a direct and proximate result of Defendants' violations of Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.), the Elliott-Larsen Civil Rights Act, MCL § 37.2101 et seq., and the common law of the State of Michigan.

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Emily Cohen (hereinafter, "Plaintiff" and/or "Ms. Cohen") brings this action as Next Friend of A.C., her minor daughter, who was fourteen years of age at all relevant times hereto.

2. At all times pertinent, Ms. Cohen and A.C. were, and currently are, citizens and residents of the State of Iowa.

3. At all times pertinent, A.C. was a student enrolled at Interlochen Arts Academy, located at 4000 J. Maddy Parkway, Interlochen, Grand Traverse County, Michigan.

4. Defendant Interlochen Center for the Arts is a Michigan non-profit corporation with its principal place of business located in the County of Grand Traverse, State of Michigan. Defendant ICA conducts business in Grand Traverse County and maintains a registered office in Grand Traverse County.

5. Defendant ICA is the parent company and sole member of Interlochen Arts Group, a Michigan nonprofit corporation incorporated for the purpose of operating Interlochen Arts Academy, a nonpublic boarding school located in Grand Traverse County, State of Michigan.

6. Defendant Interlochen Arts Group (hereinafter, "Defendant IAG"), is a Michigan nonprofit corporation doing business as Interlochen Arts Academy, with its principal place of business in Grand Traverse County, State of Michigan. Defendant IAG conducts business in Grand Traverse County and maintains its registered office in Grand Traverse County.

7. At all times pertinent, Defendant ICA and/or Defendant IAG were recipients of federal assistance within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.

8. Defendant Camille Colatosti (hereinafter, "Defendant Colatosti"), is, and was at all times pertinent, a citizen and resident of the state of Michigan, and conducted business at Defendants' campus in Grand Traverse County.

9. Defendant Colatosti was, at all times pertinent, the Provost of Interlochen Arts Academy, employed by Defendants ICA and IAG, acting within the scope of her employment. As Provost, Defendant Colatosti possessed the authority to receive and investigate reports of sexual harassment and sexual assault, to order the reassignment of student housing, to impose discipline upon students and employees, and to institute corrective and supportive measures.

10. Defendant Kristina Nichols (hereinafter, "Defendant Nichols") is, and was at all times pertinent, a citizen and resident of the state of Michigan, and conducted business at Defendants' campus in Grand Traverse County.

11. Defendant Kristina Nichols was, at all times pertinent, the Vice Provost of Education Operations of Interlochen Arts Academy and the designated Title IX Coordinator, employed by Defendants ICA and IAG, acting within the scope of her employment. As the designated official responsible for the investigation of sexual harassment complaints, Defendant Nichols possessed the authority to receive, investigate, and resolve reports of sexual harassment and sexual assault, to institute protective and supportive measures, and to direct corrective action.

12. Defendant David Heldreth (hereinafter, "Defendant Heldreth") is, and was at all times pertinent, a citizen and resident of the state of Michigan, and conducted business at Defendants' campus in Grand Traverse County.

13. At all times pertinent, Defendant Heldreth was an astronomy teacher at Interlochen Arts Academy, employed by Defendants ICA and IAG, acting within the scope of his employment.

14. At all times pertinent, Defendants Colatosti, Nichols, and Heldreth were agents of an educational institution within the meaning of MCL § 37.2401 and, as school administrators were mandated reporters within the meaning of MCL § 722.623(1)(a).

15. This action arises under Title IX of the Education Amendments of 1972, 20 U.S.C. §1681, et seq., the Elliott-Larsen Civil Rights Act (herein, "ELCRA"), MCL § 37.2101 et seq, and the common law of the state of Michigan.

16. This Honorable Court has original jurisdiction of this civil action under 28 U.S.C. §1331 as some or all of the claims of this action are arising under the "Constitution, laws, or treatises of the United States". This Honorable Court has supplemental jurisdiction under 28 U.S.C. §1367 of all other claims in this matter as they are "so related to claims in this action within such original jurisdiction that they form the same part of the same case or controversy". Additionally, this Honorable Court has diversity jurisdiction under §1332(a)(l) because the parties are completely diverse in citizenship and the amount in controversy exceeds the sum or value of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

17. This Court has personal jurisdiction over all Defendants; Defendants ICA, and/or IAG are Michigan entities with their principal places of business in the State of Michigan, Defendants Colatosti, Heldreth, and Nichols are citizens and residents of the State of Michigan, and the acts and omissions giving rise to Plaintiff's claims occurred within the State of Michigan.

18. Venue is proper in the United States District Court for the Western District of Michigan pursuant to 28 U.S.C. §1391(b)(1) and (b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in the County of Grand Traverse, State

of Michigan, which is located within the Western District of Michigan and all defendants are residents of the State of Michigan.

19. Plaintiff demands a trial by jury on all issues so triable.

## FACTUAL ALLEGATIONS

20. Plaintiff realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs as though fully set forth herein.

21. In the Fall of 2024, A.C., fourteen years old, enrolled as a high school student at Interlochen Arts Academy. This was A.C.'s first time living away from home.

22. Prior to arriving on campus for the 2024-2025 school year, Plaintiff and A.C. were given a housing questionnaire regarding room/roommate assignments. A.C. is a biological female who, along with her mother, explicitly requested that she be housed exclusively with other biological females.

### The Harassment in A.C.'s Dorm Room

23. Despite these requests, Defendants assigned A.C. to a dormitory suite she shared with a suitemate who identified as male (herein, "John Doe").

24. Shortly after the year began, A.C. was subjected to sexual harassment and sexual assault by John Doe and by Minor Students #1 and #2 within her assigned dormitory room.

25. A.C. promptly and repeatedly reported the sexual harassment and sexual assault to Defendants' residence life staff, commonly referred to on campus as "IRL's," and to other officials of Defendants with actual authority and responsibility to take corrective action in response to her reports.

26. A.C.'s complaints constituted actual notice to Defendants ICA and IAG that a fourteen-year-old student entrusted to their care was being subjected to ongoing sexual harassment in her dorm room and required protection from further misconduct.

27. Notwithstanding Defendants actual notice of ongoing sexual harassment, Defendants failed to investigate, failed to separate A.C. from the students she had identified, failed to discipline or otherwise hold those students accountable, and failed to provide A.C. with any protective or supportive measures.

28. As Defendants did not reassign A.C. and she was forced to sleep at a local hotel at her family's expense in order to avoid a dormitory she had reported to Defendants as unsafe.

29. Then, on October 9, 2024, having received no meaningful response to her prior reports, A.C. again pleaded for help by emailing Defendant Colatosti and other ICA and IAG employees directly with the subject line, "Please, I need a new roommate."

30. Within the body of the email, A.C. wrote: "I'm writing to you because I've written to everyone else here for weeks and no one is doing anything."

31. In that same email, A.C. reported the following:

a. "I'm still in a hotel because my room doesn't feel safe overnight. MY room isn't safe overnight because people are having sex."

b. "[Minor Student #1] goes up in [John Doe's] bed with her and they kiss above me and I hear them having sex. They asked if I wanted a kiss, too, and I told them I didn't, and then they laugh at me. They told me that [Minor Student #1] still has erections and that they are having 'penis and vagina' sex."

c. "[Minor Student #2] makes 'jokes' about being romantically interested in me and when I tell them that makes me uncomfortable they say they're going to kill themselves."

d. "…I talked to the IRL's about [Minor Student #2], and nothing was done."

e. "I talked to the IRL's about [John Doe], and nothing was done."

f. "This is getting so bad so quickly and nothing is being done about it. Please, I need someone to give me a room where I can study and feel safe."

32. Only after months of repeated complaints and continued sexual harassment by John Doe and Minor Students #1 and #2 did Defendants finally reassign A.C. to a sex-separated dormitory room with a female roommate.

**A.C.'s Second Dorm Room Assignment**

33. Shortly after the reassignment, A.C. observed that her new roommate was engaging in self-harming behavior and exhibiting suicidal ideation. A.C., a fourteen-year-old child, was not equipped, nor should she ever have been expected, to manage or respond to another student's serious mental health crisis.

34. Concerned for both her own well-being and the safety of her new roommate, A.C. and Ms. Cohen repeatedly notified Defendants of the circumstances and again requested that A.C. be moved to a different room.

35. Rather than address these concerns or provide A.C. with an appropriate living arrangement, Defendants told Ms. Cohen that the new room assignment was a suitable fit for both students on the basis that A.C. could serve as a support figure for her new roommate. In doing so, Defendants effectively placed upon a fourteen-year-old child the responsibility of monitoring another student who was exhibiting self-harming behavior and suicidal ideation.

**Defendant David Heldreth**

36. Then, from January 2025 through May 2025, A.C. was enrolled in an astronomy course at Interlochen Arts Academy taught by Defendant Heldreth.

37. Prior to her enrollment in that course, A.C. had been accepted into two prestigious National Aeronautics and Space Administration ("NASA") summer programs for the Summer of 2025.

38. The astronomy course at Interlochen Arts Academy is ordinarily an upper-level class reserved for juniors and seniors; however, A.C. was permitted to enroll as a freshman because admission into the NASA summer program required astronomy as a prerequisite.

39. On February 6, 2025, during a one-on-one meeting with A.C., Defendant Heldreth actively discouraged A.C. from attending the NASA summer programs; instead, he encouraged her to spend the summer with him and his former NASA colleagues, telling A.C. she could earn “big people money” by doing so.

40. Shortly thereafter, on February 13, 2025, at 9:51 p.m., Defendant Heldreth sent A.C. a message through Canvas, Defendants ICA and IAG’s online curriculum management system, instructing students to leave their dormitories after curfew to complete an unsupervised astronomy assignment.

41. Defendants ICA and IAG’s dormitory staff were not notified of this after-curfew assignment.

42. Defendant Heldreth’s after-curfew assignment directed students to perform tasks around the campus, including measuring the depth of the water at the campus lake and taking a photograph at the campus outdoor theatre.

43. At the time Defendant Heldreth issued this assignment, the outdoor theatre was under active construction, with warning signs posted prohibiting entry into that area.

44. Defendants ICA and IAG had previously sent students an email warning them not to approach the water due to slippery conditions and stating that doing so could result in expulsion.

45. Heeding Defendant ICA and IAG’s warning and fear of expulsion, A.C. did not complete the portion of Defendant Heldreth’s assignment requiring her to measure the water at the campus lake.

46. Ms. Cohen sent an email to Defendant Heldreth explaining why A.C. did not complete that portion of the assignment in light of Defendants' prior warnings. However, Defendant Heldreth did not respond.

47. As a result, A.C. lost two credit points on the assignment.

48. Defendant Heldreth subsequently spoke with A.C. and represented that he would provide her with alternative assignments to recover the two lost points.

49. As the first alternative assignment, Defendant Heldreth instructed A.C. to record herself using a protractor in the bathroom mirror. Defendant Heldreth refused to accept the video unless A.C. emailed it to him directly, rather than submit it through the schools approved curriculum program.

50. Upon reviewing the video, Defendant Heldreth advised A.C. that she was required to attend his private office hours alone so that he could review her hand position and stance as depicted in the video.

51. As a second alternative assignment, Defendant Heldreth required A.C. to write a poem entitled, "Gravity Does Not Ask for Consent."

52. As a third alternative assignment, Defendant Heldreth assigned students to examine and draw a telescope.

53. The assignment was to be completed in groups, however, A.C. was assigned to work alone. Moreover, the telescope assigned to A.C. was notably simpler than those assigned to her peers.

54. A.C. completed and submitted a sufficient drawing of her assigned telescope, yet Defendant Heldreth awarded her a grade of zero.

55. When A.C. questioned Defendant Heldreth about the zero, he told her that she would need to examine "his telescope" during a private meeting to earn the points back.

56. Over time, Defendant Heldreth began physically encroaching upon A.C. in the classroom, kicking her backpack and brushing his leg and thigh against her as he passed by her desk.

**Plaintiff's February 28, 2025 formal Title IX Concern Report**

57. On February 28, 2025, Ms. Cohen submitted a formal written Title IX Concern Report to Defendants, reporting Defendant Heldreth's conduct, including his instruction that A.C. film herself, his arbitrary grade reductions, and his insistence that A.C. meet with him alone during private office hours.

58. Later that same day, Defendant Nichols, the Title IX Coordinator, sent a follow-up email acknowledging that she oversees "issues and investigations related to sexual harassment."

59. That same day, Defendant Colatosti emailed Ms. Cohen in an apparent effort to discourage her from further pursuing a formal complaint, stating that she would "take care of it," and would "tell him to be more careful," without indicating any intention to conduct a formal investigation of the complaint.

60. In the same vein, Defendant Colatosti arbitrarily opined to Ms. Cohen that she, "do[es] not believe [Defendant Heldreth] has been inappropriate."

61. Defendant Colatosti subsequently wrote, "I am closing this matter," and instructed Ms. Cohen to have A.C. meet with the school psychologist to discuss the benefit of "moving on."

62. Upon information and belief, Defendants had not conducted any formal or meaningful investigation into A.C.'s complaints before Defendant Colatosti declared the matter closed.

63. Thereafter, A.C. refused to meet with Defendant Heldreth alone despite his requests and in retaliation for the same, Defendant Heldreth began giving A.C. grades of zero on her assignments, causing her grade in his astronomy course to drop to an F.

**Plaintiff's March 14, 2025 Request to Reopen the February 28, 2025 Report**

64. On March 14, 2025, Ms. Cohen emailed Defendants requesting that her Title IX Concern Report, originally submitted February 28, 2025, be reopened.

**Plaintiff's Inability to Access the Re-enrollment Portal**

65. In March 2025, prior to Spring Break, Defendants' re-enrollment portal was scheduled to open so that students could register for classes for the 2025-2026 school year. Ms. Cohen and A.C. were unable to access the portal or the re-enrollment contract.

66. Ms. Cohen was subsequently provided with a draft re-enrollment contract via email; however, the contract was never finalized or executed because Defendants repeatedly represented that revisions were necessary before it could be executed.

67. Prior to the re-enrollment period, A.C. met with her creative writing advisor to plan her courses for the following school year, discuss college plans, and map out how her schedule and co-curriculars at Interlochen Arts Academy would support her long-term goals. A.C. also met with the housing director to plan her living arrangements for the following year.

**A.C. Return from Spring Break**

68. On March 28, 2025, Ms. Cohen emailed Defendant Colatosti and Defendant Nichols to raise growing concerns about A.C.'s return to campus after Spring Break, as A.C. was scheduled to return to the same dormitory room as the roommate who had exhibited self-harming behavior.

69. Ms. Cohen provided Defendant Colatosti with a letter from A.C.'s physician stating that A.C. required a single-occupancy room due to the severe psychological harm she was experiencing as a result of her living situation.

70. Rather than act upon the physician's written recommendation, Defendant Colatosti questioned the letter and demanded that Ms. Cohen provide additional information about the nature of the harm before any room reassignment would be considered.

71. On April 1, 2025, Ms. Cohen received a notice purporting to permit A.C.'s re-enrollment for the 2025–2026 school year.

72. When Ms. Cohen again encountered difficulty accessing the portal and telephoned Defendants for assistance, an employee of Defendants responded: "April Fools."

73. On April 9, 2025, approximately six weeks after Ms. Cohen's February 28, 2025 Title IX Concern Report and approximately three-and-a-half weeks after her March 14, 2025 written request that the matter be reopened, A.C. received a formal email rescinding her previously accepted enrollment for the 2025–2026 school year.

74. Notably, on April 16, 2025, one week after A.C.'s enrollment was rescinded, A.C. participated in a course planning meeting with an advisor to discuss her academic plans for future years in preparation for college, reflecting that the rescission was not the product of any ordinary or anticipated academic process.

75. Defendants ICA and IAG offered to restore A.C.'s earned academic grades only on the condition that A.C. permanently withdraw from the school.

**<u>Plaintiff's April 20, 2025 Title IX Report</u>**

76. On April 20, 2025, Ms. Cohen, on behalf of A.C., submitted a second formal written Title IX Report reiterating and expanding upon the prior allegations, including that: (1) Defendant

Heldreth directed her to film herself in a bathroom; (2) Defendant Heldreth required that the video be emailed directly to him; (3) Defendant Heldreth reduced her grades following the submission of the first complaint; (4) Defendant Heldreth conditioned grade recovery on private, one-on-one meetings; and (5) access to the re-enrollment portal had been revoked.

77. A representative of Defendants' Title IX office informed Ms. Cohen that no action could be taken during Spring Break because staff members were unavailable. Nonetheless, Defendants assured Ms. Cohen that the matter would be investigated further.

78. Three days later, on April 23, 2025, Defendants formally closed the matter without conducting any meaningful investigation, concluding that Defendant Heldreth's conduct, including assigning A.C. to film herself in a bathroom, rejecting her submission, and requiring private one-on-one office hours, did not rise to the level of actionable harassment under Title IX.

79. In reaching that conclusion, Defendants expressly acknowledged that A.C. had submitted a video filmed in a bathroom, that Defendant Heldreth responded by telling her she was "holding the protractor wrong" and needed to meet privately with him to recover the points, and that Defendant Heldreth had required A.C. to write a poem titled "Gravity Does Not Ask for Consent."

80. Through this sham investigation, Defendants effectively concluded that A.C., a fourteen-year-old minor, had consented to Defendant Heldreth's sexual harassment.

**<u>Defendant David Heldreth's Conduct Continued</u>**

81. Despite multiple reports and subsequent to A.C.'s enrollment for the following year being rescinded, the harassment and discrimination continued On May 2, 2025, during astronomy class, upon learning of A.C.'s internship opportunity with the Search for Extraterrestrial Intelligence Institute ("SETI"), Defendant Heldreth told A.C. in front of her peers that she could

not work at the SETI because "it doesn't receive federal funds, so anyone can do whatever they want to you there."3

82. Thereafter, when A.C. declined to meet alone with Defendant Heldreth in his office to "make up points," he awarded her a grade of 0 out of 20 on an assignment causing her overall quarter grade to decline further.

83. Defendant Heldreth continued to harass A.C. by repeatedly requesting that she come to his office hours alone, ostensibly to complete assignments and take tests.

84. A.C. emailed other Interlochen Arts Academy teachers stating that she was being sexually harassed by a male teacher, that she was frightened of him, and that "no one will stop him." Those teachers either did not respond or responded that the matter was beyond their purview.

85. At no point did any of Defendants' employees, including Defendants Colatosti and Nichols, report the suspected sexual abuse of A.C. to the Michigan Department of Health and Human Services or to any law enforcement agency.

**Plaintiff's Injuries and Damages**

86. As a result of Defendants' conduct, A.C. was forced to avoid her dorm room and communal spaces on campus, to sleep off campus, to miss class instruction and additional mentoring, and to live in fear in a place that Defendants' told her was safe.

87. As a result of Defendants' conduct and constructive expulsion, A.C. lost her educational opportunity and a place at Interlochen Center for the Arts.

---

[3] Search for Extraterrestrial Intelligence Institute ("SETI") is a non-profit organization with the mission to "lead humanity's quest to understand the origins and prevalence of life and intelligence in the universe and share that knowledge with the world." https://www.seti.org/about/

88. As a result of Defendants' conduct, A.C. was unable to attend a boarding school in Massachusetts that had accepted her for the 2025-2026 school year, along with other prestigious educational opportunities.

89. As a direct and proximate result of Defendants' conduct, A.C. was forced to suffer economic losses, including, but not limited to: hotel expenses; tuition; room, board, and other housing costs; moving fees; fees; deposits; medical and mental health costs; loss of earnings and future earning capacity, and related costs.

90. As a direct and proximate result of Defendants' conduct alleged herein, A.C. has suffered and continues to suffer damages, including but not limited to: severe and permanent emotional distress; anxiety; depression; post-traumatic stress disorder; personal, educational, and professional harm; physical manifestations of emotional distress, including sleep disturbance, and loss of appetite, loss of self-esteem, embarrassment, humiliation, mortification, indignity, disgrace, fright and grief, and loss of enjoyment of life; mental health treatment; and other damages as set forth herein.

## COUNT I

**TITLE IX, 20 U.S.C. § 1681 ET SEQ. – SEXUAL HARASSMENT AND DELIBERATE INDIFFERENCE**

***(Plaintiff v. Defendants ICA and IAG)***

91. Plaintiff realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs as though fully set forth herein.

92. Title IX of the Education Amendments of 1972 provides that no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance. 20 U.S.C. § 1681(a).

93. At all times pertinent, A.C. was a person within the meaning of 20 U.S.C. § 1681(a), a student and participant in an educational program operated by Defendants ICA and IAG, and a member of the class of persons Title IX was enacted to protect.

94. At all times pertinent, Defendants ICA and IAG were recipients of federal financial assistance within the meaning of Title IX and were therefore subject to the requirements and prohibitions of Title IX.

95. Defendants hold themselves out as subject to Title IX, maintain a Title IX department, have a designated Title IX Coordinator, maintain a written Gender Discrimination and Sexual Harassment Policy, and maintain a Title IX Concern Report process through which students and parents are directed to report sexual harassment.

96. At all times pertinent, Defendant Colatosti served as Defendants' Provost and had the authority to institute corrective measures.

97. At all times pertinent, Defendant Nichols served as Defendants' Vice Provost of Education Operations and designated Title IX Coordinator and had the authority to institute corrective measures. On February 28, 2025, Defendant Nichols acknowledged in writing that she oversees "issues and investigations related to sexual harassment."

98. Defendants' Gender Discrimination and Sexual Harassment Policy states that Defendants developed their internal policies and procedures "[t]o ensure compliance with federal and state civil rights laws and regulations."

99. Plaintiff submitted the reports described herein through the Title IX reporting process Defendants established and directed Plaintiff to use, and Defendants processed and closed those reports through their Title IX department.

100. Defendants were required, under Title IX and their own express written policies, to respond to allegations of sexual assault, sexual abuse, sexual harassment, and other prohibited conduct in a manner that was not clearly unreasonable in light of the circumstances known to them.

101. Defendants were required, under Title IX and their own express written policies, to investigate reported claims of sexual assault or sexual harassment and to document the findings thereof.

102. Pursuant to Title IX, Defendants were prohibited from discriminating on the basis of sex.

103. At all times pertinent, Defendants exercised substantial control over both the harassers and the context in which the harassment occurred. The dormitory in which A.C. resided was owned, assigned, and controlled by Defendants, the classroom in which A.C. was harassed was operated by Defendants, and Defendant Heldreth was employed by Defendants and subject to their supervision and discipline.

104. Defendants Colatosti and Nichols, and other employees of Defendants to whom A.C. reported sexual harassment, sexual assault, or other prohibited conduct, were "appropriate persons" within the meaning of Title IX, possessing authority to address and report sex discrimination, to request and conduct investigations, and to institute corrective measures.

105. During her enrollment at Interlochen Arts Academy, A.C. was subjected to severe, pervasive, and objectively offensive sexual harassment and sexual assault on the basis of sex, including:

a. Repeated sexual harassment and sexual assaults by her suitemate, John Doe, and by Minor Students #1 and #2, including unwanted sexual solicitation and prolonged exposure to sexual activity in her dormitory room; and

b. A sustained and escalating pattern of sexual harassment by Defendant Heldreth, including, but not limited to:

i. Instructing A.C. to film herself in a bathroom and to submit the recording directly to him;

ii. Summoning A.C. to meet him alone in his office to review her hand position and stance as depicted in that recording;

iii. Requiring A.C. to write a poem entitled "Gravity Does Not Ask for Consent";

iv. Conditioning grade recovery upon private and unsupervised meetings alone with him;

v. Instructing A.C. that she was required to examine "his telescope";

vi. Singling A.C. out for disparate and punitive academic treatment;

vii. Telling A.C. that she should not work at SETI because "it doesn't receive federal funds, so anyone can do whatever they want to you there"; and

viii. Making repeated unwanted physical contact with A.C. in the classroom.

106. The harassment was so severe, pervasive, and objectively offensive that it effectively denied A.C. equal access to the educational opportunities and benefits provided by Defendants because of her sex. Specifically, A.C. was forced to avoid her dormitory room, to avoid communal spaces, to sleep off campus, to miss educational instruction, and to endure persistent anxiety and fear, all of which materially impaired her ability to participate in and benefit from her education.

107. One or more officials of Defendants with authority to respond on behalf of Defendant ICA and IAG and had authority to institute corrective measures, including Defendants Colatosti and Nichols, had actual notice and knowledge of the harassment described herein, including through:

a. A.C.'s direct and repeated oral reports to residence life staff and other officials of Defendants regarding the conduct of John Doe and Minor Students #1 and #2;

b. A.C.'s written report on October 9, 2024 via email to Defendant Colatosti and other employees of Defendants detailing the ongoing sexual harassment and assault occurring in her dormitory room;

c. Plaintiff's February 28, 2025 formal Title IX Concern Report, detailing Defendant Heldreth's pattern of harassing conduct toward A.C.;

d. Plaintiff's written request on March 14, 2025, that the February 28, 2025 matter be reopened;

e. A.C.'s emails to other Interlochen Arts Academy teachers stating that she was being sexually harassed by a male teacher, that she was frightened of him, and that "no one will stop him"; and

f. Plaintiff's second formal Title IX Report on April 20, 2025.

108. Upon receiving actual notice of the harassment described herein, Defendants had the authority and the obligation to respond on behalf of Defendants ICA and IAG, including to take corrective action and provide supportive measures to A.C., but failed to respond and/or responded in a way that evidenced deliberate indifference, which was clearly unreasonable in light of the known circumstances.

109. Despite receiving actual notice, Defendants failed to respond and/or responded with deliberate indifference, including by:

a. Failing to investigate A.C.'s reports of sexual harassment and sexual assault by John Doe, Minor #1 and #2, for months following her initial complaints, despite repeated notice of ongoing and escalating conduct;

b. Repeatedly denying and delaying A.C.'s requests for a room reassignment despite actual notice of ongoing sexual harassment and assault;

c. Forcing A.C. to continue residing with her assailants, rendering her living situation so untenable that she was compelled to seek refuge in a local hotel for weeks at her family's expense;

d. Failing to conduct any individualized safety or risk assessment with respect to John Doe following A.C.'s reports, and failing to adhere to Defendants' own express policies regarding sanctions for the conduct reported;

e. Reassigning A.C., a fourteen-year-old who had just endured months of unremedied harassment, to a room with a student exhibiting suicidal tendencies, and informing Ms. Cohen that it was A.C.'s "job" to serve as a support figure, rather than providing A.C. the supportive measures and safe housing to which she was entitled;

f. Failing to conduct any meaningful investigation into Plaintiff's February 28, 2025 formal Title IX Concern Report;

g. Formally closing the aforementioned report three days after it was reopened, without any meaningful inquiry, and concluding that Defendant Heldreth's conduct did not rise to the level of actionable harassment;

h. Permitting Defendant Heldreth to continue teaching and maintain unsupervised access to students, including A.C., thereby allowing his inappropriate conduct to continue and escalate; and

i. Failing to provide any supportive measure, protective accommodation, or interim relief to A.C. at any point during the foregoing course of conduct, despite repeated requests and a treating physician's written recommendation that A.C. be assigned a single-occupancy room.

110. Defendants' deliberate indifference subjected A.C. to further harassment and to a sexually hostile educational environment and thereby denied her access to the educational benefits and opportunities Defendants provided.

111. Defendants' failure to investigate, respond to, and remedy the harassment after receiving actual notice was clearly unreasonable in light of the circumstances known to them, and caused A.C. to suffer additional and escalating harassment and harm that would not have occurred but for Defendants' acts or omissions.

112. The harassment described herein, had the potential for a systemic effect on a program or activity, including Defendants.

113. As a direct and proximate result of Defendants' deliberate indifference to known sexual harassment and sexual assault in violation of Title IX, A.C. has suffered and continues to suffer damages as set forth above.

## COUNT II

**TITLE IX, 20 U.S.C. § 1681 ET SEQ. – RETALIATION & DELIBERATE INDIFFERENCE**
***(Plaintiff v. Defendants ICA and IAG)***

114. Plaintiff realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs as though fully set forth herein.

115. Title IX prohibits recipients of federal financial assistance from retaliating against individuals who report sex discrimination, file complaints, or otherwise engage in protected activity under the statute. 20 U.S.C. § 1681 et seq.

116. A.C. and Plaintiff engaged in protected activity under Title IX, including, but not limited to:

a. A.C.'s repeated oral and written reports of sexual harassment and sexual assault to residence life staff and other officials of Defendants;

b. Plaintiff's written report of October 9, 2024 via email to Defendant Colatosti and other officials of Defendants;

c. Plaintiff's February 28, 2025 formal Title IX Concern Report, concerning Defendant Heldreth;

d. Plaintiff's March 14, 2025 written request that the matter be reopened;

e. A.C.'s emails to other Interlochen Arts Academy teachers reporting that she was being sexually harassed by a male teacher; and

f. Plaintiff's second formal Title IX Report on April 20, 2025.

117. Defendants had actual knowledge of that protected activity, as each report and complaint was submitted directly to Defendants' officials and Title IX personnel with authority to respond.

118. Following that protected activity, Defendants took the following materially adverse actions against A.C.:

a. Defendant Colatosti closed the matter without any meaningful inquiry, stated "I do not believe he has been inappropriate," and directed that A.C. be counseled upon the benefits of "moving on";

b. Defendant Heldreth, acting within the course and scope of his employment, began awarding A.C. grades of zero immediately following Plaintiff's February 28, 2025 Title IX Concern Report, causing her grade in his course to fall to an F;

c. Defendants blocked A.C.'s and Plaintiff's access to the re-enrollment portal for the 2025-2026 school year and intentionally failed to finalize the re-enrollment contract;

d. Defendants rescinded A.C.'s previously accepted enrollment for the 2025-2026 school year on April 9, 2025, approximately six weeks after the February 28, 2025 Title IX Concern Report and approximately three and a half weeks after the March 14, 2025 request that the matter be reopened;

e. Defendants offered to restore A.C.'s earned academic grades only upon the condition that she withdraw permanently from the school;

f. Defendants permitted the retaliatory grades to stand upon A.C.'s academic record after being informed in writing of the reason they were imposed;

g. Defendants constructively expelled A.C. from Interlochen Arts Academy.

119. A causal connection exists between the protected activity and the adverse actions. The grade retaliation began immediately upon Plaintiff's February 28, 2025 formal Title IX Concern Report, the enrollment rescission followed within weeks of that report and of the March 14, 2025 request that the matter be reopened, was made contemporaneously with Plaintiff's continued advocacy.

120. No intervening event supplies a legitimate explanation for Defendants' conduct. A.C. committed no disciplinary infraction, held no disciplinary record, and was, one week after her enrollment was rescinded, still meeting with Defendants' own advisor to plan her courses for the following academic year.

121. Any reason Defendants advance for the adverse actions is pretextual.

122. Defendants' retaliatory conduct was materially adverse and would deter a reasonable student in A.C.'s position, or a reasonable parent acting on such a student's behalf, from engaging in protected activity under Title IX.

123. Defendants had actual knowledge that A.C. was subjected to retaliation in response to that protected activity.

124. Despite actual knowledge of the foregoing, Defendants took no steps to investigate the retaliation, to restore A.C.'s grades, to reinstate her enrollment, to provide protective measures, or otherwise to remedy the harm caused to A.C.

125. Defendants' response to known retaliation was clearly unreasonable in light of the circumstances known to them.

126. Defendants' deliberate indifference to known retaliation caused A.C. to suffer further and compounding harm, including her constructive expulsion from Interlochen Arts Academy, that would not have occurred but for Defendants' acts or omissions.

127. As a direct and proximate result of Defendants' retaliation in violation of Title IX, A.C. has suffered and continues to suffer damages as set forth above.

## COUNT III
## ELLIOTT-LARSEN CIVIL RIGHTS ACT, MCL § 37.2402 – QUID PRO QUO SEXUAL HARASSMENT
**(*Plaintiff v. Defendants ICA, IAG, and Heldreth*)**

128. Plaintiff alleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs as though fully set forth herein.

129. MCL § 37.2402 provides that an educational institution shall not "(a) discriminate against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of religion, race, color, national origin, sex, sexual orientation, or gender identity or expression."

130. MCL § 37.2401 defines "educational institution as, "a public or private institution, or a separate school or department thereof, and includes an academy, college, elementary or secondary school, extension course, kindergarten, nursery, local school system, university, or a business, nursing, professional, secretarial, technical, or vocational school; and includes an agent of an educational institution."

131. Educational institution includes an "agent of an educational institution." MCL § 37.2401.

132. MCL § 37.2103(k) provides that "discrimination because of sex includes sexual harassment," and defines sexual harassment to mean unwelcome sexual advances, requests for sexual favors, and other verbal or physical contact or communication of a sexual nature where "(i) submission to the conduct or communication is made a term or condition either explicitly or implicitly to obtain… education," or "(ii) submission to or rejection of the conduct or communication by an individual is used as a factor in decisions affecting the individual's…education."

133. At all times pertinent, Defendants ICA and IAG were an educational institution operating Interlochen Arts Academy; A.C. was a fourteen-year-old student enrolled there; Defendant Colatosti and Nichols were agents of an educational institutional within the meaning of MCL 37.2401; and Defendant Heldreth was A.C.'s classroom teacher, Defendants' employee, and an agent of an educational institution within the meaning of MCL § 37.2401.

134. Defendant Heldreth subjected A.C. to unwelcome conduct and communication of a sexual nature, including by:

a. Directing a 14-year-old female freshman student to film herself and email the recording to him personally rather than submit it through Defendants' learning management system;

b. By summoning A.C. to meet him alone in his office to review her hand position and stance as depicted in that recording;

c. By requiring A.C. to write a poem titled "Gravity Does Not Ask for Consent";

d. By telling A.C. she was required to examine "his telescope" during a private meeting;

e. By repeatedly demanding that A.C. attend his office hours alone;

f. By telling A.C. before her classmates that she could not work at SETI because "it doesn't receive federal funds, so anyone can do whatever they want to you there"; and

g. By repeatedly brushing his leg and thigh against A.C.'s arm and thigh as he passed her desk.

135. A.C. rejected Defendant Heldreth's disturbing demands.

136. Defendant Heldreth was in a position to offer a benefit to A.C., including, but not limited to educational benefits and grades. Defendant Heldreth was acting within his authority to grant or deny A.C. a benefit.

137. A.C. refused to submit to and rejected Defendant Heldreth's conduct.

138. Defendant Heldreth then used that as a factor in decisions affecting A.C.'s education. He awarded her grades of zero, causing her grade in the course to fall to an F, awarded her a 0 out of 20 on an assignment, and continued to condition restoration of those grades on private meetings.

139. Defendant Heldreth's decision affecting A.C.'s education was made directly following A.C. refusal to submit and rejections of his unwanted sexual conduct, advances, and demands.

140. The grades were not the product of any deficiency in A.C.'s work.

141. The failing grades were a tangible educational detriment affecting A.C.'s academic standing, her academic record, and her educational opportunities.

142. Furthermore, Defendants ICA and IAG are liable under the doctrine of respondeat superior.

143. On February 28, 2025; March 14, 2025 (request to re-open February 28, 2025 report); and April 20, 2025, Defendants received formal Title IX Concern Reports from Plaintiff, regarding Defendant Heldreth's actions.

144. Defendants, in closing Plaintiff's Title IX Report, expressly acknowledged that A.C. had submitted a video filmed in a bathroom, that Defendant Heldreth had responded by telling her she was "holding the protractor wrong" and needed to meet privately with him to recover the points, and that he had required her to write a poem titled "Gravity Does Not Ask for Consent."

145. Defendant ICA and IAG thereby had actual knowledge of Defendant Heldreth's prior conduct toward A.C. and actual knowledge of his propensity to continue it. Defendant Heldreth's conduct was not remote in time, was not dissimilar in kind, and was directed at the same student. It was reported while it was ongoing.

146. Notwithstanding that knowledge, Defendants ICA and IAG conducted no investigation, imposed no discipline, restored none of the grades, and returned Defendant Heldreth to the classroom with continued unsupervised access to A.C.

147. As a direct and proximate result of the quid pro quo sexual harassment alleged in this Count, A.C. has suffered and continues to suffer damages as set forth above.

## COUNT IV

### ELLIOTT-LARSEN CIVIL RIGHTS ACT, MCL § 37.402 – HOSTILE EDUCATIONAL ENVIRONMENT

**(*Plaintiff v. All Defendants*)**

148. Plaintiff alleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs as though fully set forth herein.

149. MCL § 37.2402 provides that an educational institution shall not "(a) discriminate against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of religion, race, color, national origin, sex, sexual orientation, or gender identity or expression."

150. MCL § 37.2103(k)(iii) defines sexual harassment to include unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature where "the conduct or communication has the purpose or effect of substantially interfering with an individual's… education… or creating an intimidating, hostile, or offensive… educational… environment."

151. Defendant Heldreth subjected A.C. to unwelcome conduct and communication of a sexual nature because of A.C.'s sex, including, but not limited to the following:

a. Directing a 14-year-old female freshman student to film herself and email the recording to him personally rather than submit it through Defendants' learning management system;

b. By summoning A.C. to meet him alone in his office to review her hand position and stance as depicted in that recording;

c. By requiring A.C. to write a poem titled "Gravity Does Not Ask for Consent";

d. By telling A.C. she was required to examine "his telescope" during a private meeting;

e. By repeatedly demanding that A.C. attend his office hours alone;

f. By telling A.C. before her classmates that she could not work at SETI because "it doesn't receive federal funds, so anyone can do whatever they want to you there"; and

g. By repeatedly brushing his leg and thigh against A.C.'s arm and thigh as he passed her desk.

152. The conduct had the purpose and effect of substantially interfering with A.C.'s education and of creating an intimidating, hostile, and offensive educational environment. A.C.'s

grade in the course fell from passing to an F and she was compelled to choose between her academic standing and refusing to be alone with an adult who frightened her and she avoided instruction and ultimately was constructively expelled from the institution.

153. A reasonable fourteen-year-old student in A.C.'s position who was required to attend the class, dependent upon the perpetrator for her grade, and having reported him without result, would have found the environment intimidating, hostile, and offensive.

154. Furthermore, Defendants ICA and IAG are liable under the doctrine of respondeat superior.

155. Defendants ICA, IAG, Colatosti and/or Nichols received actual notice of Defendant Heldreth's conduct on February 28, 2025, again on March 14, 2025, and again on April 20, 2025.

156. Upon that notice, Defendants were obligated to take prompt and adequate remedial action reasonably calculated to end the harassment. However, Defendants took no such action.

157. Notwithstanding that knowledge, Defendants ICA, IAG, Colatosti, and/or Nichols restored none of A.C.'s grades, imposed no discipline upon Defendant Heldreth, and returned him to the classroom with continued unsupervised access to A.C.

158. As a direct and proximate result of the hostile education environment alleged in this Count, A.C. has suffered and continues to suffer damages as set forth above.

## COUNT V
**ELLIOTT-LARSEN CIVIL RIGHTS ACT, MCL § 37.2402 – HOSTILE HOUSING ENVIRONMENT**
**(*Plaintiff v. Defendants ICA, IAG, Colatosti, and Nichols*)**

159. Plaintiff alleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs as though fully set forth herein.

160. MCL § 37.2402 provides that an educational institution shall not "(a) discriminate against an individual in the full utilization of or benefit from the institution, or the services,

activities, or programs provided by the institution because of religion, race, color, national origin, sex, sexual orientation, or gender identity or expression."

161. MCL § 37.2103(k)(iii) defines sexual harassment to include unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature where "the conduct or communication has the purpose or effect of substantially interfering with an individual's… housing, or creating an intimidating, hostile, or offensive… housing environment."

162. Interlochen Arts Academy is a boarding school. Residential housing was a service, activity, or program that Defendants provided to A.C. as part of her enrollment. Defendants assigned her room, controlled that assignment, and alone possessed the authority to change it.

163. Beginning within the first weeks of the Fall 2024 term, A.C. was subjected to unwelcome conduct of a sexual nature in the room Defendants assigned her because of her sex, including, but not limited to the following:

a. being solicited by her suitemates with the question whether she "wanted a kiss,";

b. being laughed at when she declined;

c. being required to sleep in a room in which other students engaged in sexual intercourse in the bunk directly above her, and;

d. being subjected to explicit descriptions of that sexual activity, including that they were having "penis and vagina" sex.

164. A.C. reported the conduct to Defendants' residence life staff over a period of weeks and nothing was done.

165. On October 9, 2024, she wrote directly to Defendant Colatosti via email, under the subject line "Please, I need a new roommate."

166. She reported that she was sleeping at a hotel because her room was not safe overnight, that students were having sex in her room, that she had been asked whether she wanted a kiss and laughed at when she declined, that a student threatened suicide when she objected to his overtures, that she had already told the residence life staff and "nothing was done," and that she needed "a room where I can study and feel safe."

167. Upon receiving that notice, Defendants were obligated to take prompt and adequate remedial action reasonably calculated to end the harassment.

168. Defendants ICA, IAG, Colatosti, and/or Nichols conducted no investigation, imposed no discipline upon any student, made no assessment of the risk to A.C. of continued shared occupancy, and failed for months to move A.C. out of the room she had reported as unsafe.

169. Defendants' conduct had the purpose and effect of substantially interfering with A.C.'s housing and of creating an intimidating, hostile, and offensive housing environment which denied her the full utilization of and benefit from the services and programs Defendants provided, because of her sex.

170. A reasonable child in A.C.'s position would have found the housing environment Defendants maintained intimidating, hostile, and offensive.

171. As a direct and proximate result of the hostile housing environment alleged in this Count, A.C. has suffered and continues to suffer damages as set forth above.

## COUNT VI
**ELLIOTT-LARSEN CIVIL RIGHTS ACT, MCL § 37.2701 – RETALIATION**
**(*Plaintiff v. All Defendants*)**

172. Plaintiff alleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs as though fully set forth herein.

173. MCL § 37.2701(a) provides that a person shall not "retaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act."

174. Additionally, MCL § 37.2701(f) provides that a person shall not "coerce, intimidate, threaten, or interfere with a person in the exercise or enjoyment of, or on account of his or her having aided or encouraged a third person in the exercise or enjoyment of, a right granted or protected by this act".

175. Plaintiff engaged in a protected activity under ELCRA by opposing sexual harassment and by making complaints regarding sexual harassment and abuse, including,

a. A.C.'s repeated oral reports to Defendants' residence life staff;
b. A.C. written report of October 9, 2024 via email to Defendant Colatosti;
c. Plaintiff's February 28, 2025 formal Title IX Concern Report;
d. Plaintiff's March 14, 2025 written request to re-open the February 28, 2025 Title IX Concern Report;
e. A.C.'s emails to other Interlochen Arts Academy teachers reporting that she was being sexually harassed by a male teacher; and
f. Plaintiff's second formal Title IX Report on April 20, 2025.

176. Defendants had actual knowledge of that protected activity. Each of Plaintiff's reports was directed to Defendants' agents, including Defendant Colatosti, Defendant Nichols, and Defendants ICA and IAG's residence life staff and faculty.

177. In retaliation of Plaintiff's protected activity and zealous advocacy, in violation of MCL § 37.3701(a), Defendants took adverse actions against A.C., including, but not limited to the following:

a. Failing to provide supportive measures in response to her complaints of sexual harassment and/or otherwise prohibited conduct under the ELCRA and as required by Defendants' own policies;

b. Immediately following Plaintiff's February 28, 2025 formal Title IX Concern Report, Defendant Heldreth began awarding A.C. grades of zero, causing her grade in his course to fall to an F, and thereafter awarded her a 0 out of 20 on an assignment when she declined to meet with him alone;

c. Defendant Colatosti closed the inquiry without investigation, wrote "I do not believe he has been inappropriate," and directed that A.C. be sent to the school psychologist to discuss the benefits of "moving on";

d. Defendant Nichols closed the reopened matter three days after it was reopened without conducting any inquiry;

e. Defendants denied A.C. and her mother access to the re-enrollment portal at the time it opened to other students and never finalized the re-enrollment contract; when A.C.'s mother telephoned regarding her inability to access the portal, an employee of Defendants responded "April Fools";

f. On April 9, 2025, Defendants rescinded the enrollment A.C. had been offered and had accepted for the 2025-2026 school year;

g. Defendants thereafter offered to restore A.C.'s earned academic grades only upon the condition that she withdraw permanently from the institution.

h. Defendants permitted the failing grades to stand upon A.C.'s academic record, restored nothing, and returned Defendant Heldreth to the classroom with continued unsupervised access to her.

178. Defendants thereby constructively expelled A.C. from Interlochen Arts.

179. Each of the foregoing was materially adverse and would dissuade a reasonable student in A.C.'s position from making or supporting a charge of sexual harassment.

180. A causal connection exists between the protected activity and the adverse actions as Defendant Heldreth's grade retaliation began immediately upon Plaintiff's February 28, 2025

formal Title IX Concern Report; A.C.'s enrollment was rescinded approximately six weeks after that report and approximately three and one-half weeks after the March 14, 2025, request that the matter be reopened; and the actions of the Defendants' happened in direct response to Plaintiff's complaints and reports of sexual harassment and abuse.

181. Any reason Defendants advance for the adverse actions is pretextual.

182. The denial of access to the re-enrollment portal, the rescission of A.C.'s enrollment, the conditioning of her earned grades upon her permanent withdrawal, the closure of both inquiries without investigation, and the decision to leave a retaliatory grade in place were institutional decisions, made by Defendant ICA and IAG's own officials exercising the authority Defendants conferred upon them, in the conduct of Defendants' business.

183. As a direct and proximate result of the retaliation alleged in this Count, A.C. has suffered and continues to suffer damages as set forth above.

## COUNT VII
### ASSAULT
### (*Plaintiff v. Defendant Heldreth*)

184. Plaintiff alleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs as though fully set forth herein.

185. Under Michigan law, an assault is an intentional act that placed another person in reasonable apprehension of imminent harmful or offensive contact.

186. Defendant Heldreth intentionally engaged in conduct that placed A.C. in reasonable apprehension of an imminent harmful or offensive contact, including by:

a. His sustained and deliberate pattern of physical encroachment in the classroom of repeatedly kicking A.C.'s backpack and brushing against her arms and thigh as he passed her desk;

b. His repeated and insistent demands that A.C. come to his private office alone under the guise of completing assignments and recovering grades;

c. Telling A.C. that she needed to examine "his telescope" during a private meeting in order to earn back a zero grade; and

d. His statement that A.C. could not work at SETI because "it doesn't receive federal funds, so they can do whatever they want to you there."

187. A.C.'s apprehension of imminent harmful or offensive contact by Defendant Heldreth was objectively reasonable.

188. A reasonable minor student in A.C.'s position would have experienced the same apprehension.

165. Defendant Heldreth acted intentionally and with knowledge that his conduct would place A.C. in a reasonable apprehension of imminent harmful or offensive contact.

166. As a direct and proximate result of Defendant Heldreth's assault alleged in this Count, A.C. has suffered and continues to suffer damages as set forth above.

## COUNT VIII
### MICHIGAN CHILD PROTECTION LAW, MCL §722.623 – FAILURE TO REPORT
### (*Plaintiff v. Defendants ICA, IAG, Colatosti, and Nichols*)

189. Plaintiff alleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs as though fully set forth herein.

190. The Michigan Child Protection Law, MCL § 722.621 *et seq.*, imposes mandatory reporting obligations upon designated persons who suspect child abuse or neglect.

191. MCL § 722.623(1)(a) designates as mandatory reporters, among others, school administrators, school counselors, and teachers.

192. At all times pertinent, Defendants Colatosti and Nichols, and other teachers to whom A.C. reported were school administrators within the meaning of MCL § 722.623(1)(a).

193. MCL § 722.622 defines "child abuse" as "harm or threatened harm to a child's health or welfare that occurs through nonaccidental physical or mental injury, sexual abuse, sexual

exploitation, or maltreatment, by a parent, legal guardian, any other person responsible for the child's health or welfare, a teacher, a teacher's aide, a member of the clergy, or an individual 18 years of age or older who is involved with a youth program."

194. MCL § 722.623(1) requires that a mandatory reporter who has reasonable cause to suspect child abuse or neglect make an immediate report to the Michigan Department of Health and Human Services by telephone, followed by a written report within 72 hours.

195. MCL § 722.633(1) provides that a person who is required by the act to report an instance of suspected child abuse or neglect, and who fails to do so, is civilly liable for the damages proximately caused by that failure.

196. Defendants had reasonable cause to suspect that A.C., a fourteen-year-old child in their care and custody, was the victim of child abuse, including but not limited to:

a. Plaintiff's February 28, 2025 formal Title IX Concern Report describing an adult teacher instructing a fourteen-year-old student to film herself in a bathroom and transmit the video to him personally, and conditioning her grades on private unsupervised meetings alone with him;

b. Plaintiff Emily Cohen's March 14, 2025 written request that the February 28, 2026 matter be reopened;

c. A.C.'s emails to other Interlochen Arts Academy teachers stating that she was being sexually harassed by a male teacher, that she was frightened of him, and that "no one will stop him"; and

d. Plaintiff's second formal Title IX Report on April 20, 2025.

197. Notwithstanding this reasonable cause to suspect child abuse, Defendants Colatosti and Nichols, and the other mandatory reporters employed by Defendants ICA and/or IAG, failed to make any report to the Michigan Department of Health and Human Services or to any law enforcement agency.

198. Instead of reporting, Defendants closed their own internal inquiry without investigation and permitted Defendant Heldreth to retain unsupervised access to A.C. and to other minor students.

199. Defendants ICA and IAG are liable for the failure of their employees to report under the doctrine of respondeat superior, and are separately liable for failing to adopt, maintain, and enforce policies and training sufficient to ensure compliance with the Michigan Child Protection Law.

200. Had Defendants complied with their statutory reporting obligations, the abuse of A.C. would have been investigated by trained child protection authorities and law enforcement, Defendant Heldreth would have been removed from contact with A.C., and A.C. would have been spared the additional and escalating harm she thereafter suffered.

201. As a direct and proximate result of Defendants violation of the Child Protection Law alleged in this Count, A.C. has suffered and continues to suffer damages as set forth above.

**COUNT IX**
**NEGLIGENT SUPERVISION**
**(*Plaintiff v. Defendants ICA and IAG*)**

202. Plaintiff alleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs as though fully set forth herein.

203. At all times relevant, Defendants ICA and IAG had a duty to exercise reasonable care in the supervision of their employees and students, including Defendant Colatosti, Nichols, Heldreth, John Doe, and Minor Students #1 and #2.

204. This duty arose from the special relationship between Defendants and the minor students enrolled at Interlochen Arts Academy, including A.C., and from Defendants' exercise of custody and control over those students and their employees during the school day, in dormitory settings, and during all school-sponsored programs and activities.

205. Defendants ICA and IAG knew or reasonably should have known of the need to exercise supervisory control over Defendant Heldreth and the student residents of A.C.'s dormitory, including through:

a. A.C.'s repeated oral and written reports of sexual harassment and assault by John Doe and Minor Students #1 and #2 to dormitory staff and ICA and/or IAG officials;

b. A.C.'s October 9, 2024 detailed written report via email to Defendant Colatosti describing ongoing sexual conduct, coercive behavior, and threats occurring in A.C.'s dormitory room;

c. P Plaintiff's February 28, 2025 formal Title IX Concern Report detailing Defendant Heldreth's harassing and grooming conduct toward A.C., including his instruction that A.C. film herself and send him the video, and his conditioning of grade recovery on private unsupervised meetings; and

d. Plaintiff's second formal Title IX Report on April 20, 2025 detailing Defendant Heldreth's continued and escalating pattern of misconduct.

206. Defendants ICA and IAG breached their duty of reasonable supervision by:

a. Failing to adequately supervise Defendant Heldreth, allowing him to maintain unsupervised access to minor female students, assign after-hours unsupervised activities near a construction zone and body of water without notifying dormitory staff, instruct minor students to film themselves and send him the video, and condition grade recovery on private one-on-one meetings;

b. Failing to adequately supervise dormitory residents, including John Doe and Minor Students #1 and #2, despite receiving actual notice of ongoing sexual harassment and assault occurring in A.C.'s dormitory room;

c. Failing to implement adequate supervisory protocols to prevent employees from engaging in one-on-one unsupervised meetings with minor students;

d. Failing to take any supervisory action in response to A.C.'s reports to other IAC and IAG teachers that she was being sexually harassed by a male teacher and that "no one will stop him," where those teachers either did not respond or indicated the matter was beyond their purview; and

e. Failing to implement and enforce reasonable policies, procedures, and supervision protocols sufficient to protect minor students from foreseeable sexual harassment and assault by employees and other students on campus.

207. Defendants' failure to exercise reasonable supervisory control was the direct and proximate cause of A.C.'s injuries, as adequate supervision would have prevented or curtailed the sexual harassment, assault, grooming, and hostile educational environment to which A.C. was subjected.

208. As a direct and proximate result of Defendants Negligent Supervision alleged in this Count, A.C. has suffered and continues to suffer damages as set forth above.

**COUNT X**
**NEGLIGENT RETENTION**
**(*Plaintiff v. Defendants ICA and IAG*)**

209. Plaintiff alleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs as though fully set forth herein.

210. At all times relevant, Defendants ICA and IAG had a duty to exercise reasonable care in the retention of their employees, including the duty to investigate employee misconduct, take appropriate disciplinary action, and remove from student contact any employee whose continued presence posed a foreseeable risk of harm to minor students.

211. Defendants ICA and IAG knew or reasonably should have known that Defendant Heldreth posed a foreseeable risk of harm to minor female students, including A.C., through:

a. Defendant Heldreth's February 6, 2025 attempt to discourage A.C. from attending two prestigious NASA summer programs and his encouragement that she spend the summer with him and his friends to earn "big people money";

b. Defendant Heldreth's February 13, 2025 after-curfew assignment sending minor students outside unsupervised near a construction zone and a body of water without notifying dormitory staff;

c. Plaintiff's February 28, 2025 formal Title IX Concern Report detailing Defendant Heldreth's instruction that A.C. film herself and email the video directly to him, his conditioning of grade recovery on private unsupervised meetings, and his arbitrary grade reductions following Plaintiff's complaint;

d. Defendant Heldreth's requirement that A.C. write a poem titled "Gravity Does Not Ask for Consent" as a condition of recovering lost assignment points;

e. Defendant Heldreth's instruction that A.C. examine "his telescope" during a private meeting in order to recover a zero grade;

f. Defendant Heldreth's repeated physical encroachment on A.C. in the classroom, including kicking her backpack and brushing against her arm and thigh as he passed her desk; and

g. Plaintiff's second formal Title IX Report on April 20, 2025 detailing Defendant Heldreth's continued and escalating pattern of harassment, grooming, and retaliation.

212. Despite actual knowledge of the foregoing conduct, Defendants ICA and IAG retained Defendant Heldreth in his position as an astronomy teacher with continued unsupervised access to minor female students, including A.C., and took no meaningful disciplinary or remedial action against him.

213. Defendants' retention of Defendant Heldreth following actual notice of his predatory conduct toward A.C. was unreasonable and constituted a breach of their duty of care to A.C. and other minor students enrolled at Interlochen Arts Academy.

214. As a direct and proximate result of Defendants Negligent Retention alleged in this Count, A.C. has suffered and continues to suffer damages as set forth above.

**COUNT XI**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(*Plaintiff v. Defendant Heldreth*)**

215. Plaintiff realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

216. To establish an Intentional Infliction of Emotion Distress Claim, Plaintiff must show (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress.

217. Defendant Heldreth's conduct was extreme and outrageous, was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and was atrocious and utterly intolerable in a civilized community, including:

a. On February 6, 2025, he discouraged A.C. from attending the two NASA summer programs to which she had been accepted, and instead solicited her to spend the summer with him and his friends to earn "big people money";

b. On February 13, 2025, at 9:51 p.m., he directed students including A.C., by message through Canvas, to leave their dormitories after curfew to complete an unsupervised assignment, without notice to dormitory staff;

c. He directed that the assignment be completed in areas of campus that Defendant ICA had separately warned students to avoid on pain of expulsion, and then penalized A.C. two credit points when she complied with ICA's warning rather than his instruction;

d. He conditioned restoration of those points on A.C. filming herself alone, using a protractor before a mirror, and refused to accept the recording unless A.C. emailed it directly to him;

e. Upon receiving that recording, he wrote to A.C. that she was required to attend his private office hours alone so that he could review her "hand position and stance";

f. He required A.C., as a condition of earning assignment points, to author a poem titled "Gravity Does Not Ask for Consent";

g. He assigned A.C. to examine a telescope alone while assigning her classmates to groups, gave her a grade of zero on a drawing that was accurate and sufficient, and told her that to recover the points she would have to examine "his telescope" during a private meeting;

h. He repeatedly demanded that A.C. appear alone at his office hours under the pretext of completing assignments and taking examinations; and

i. In the presence of A.C.'s peers, he told her that she could not work at the Search for Extraterrestrial Intelligence Institute ("SETI") because "it doesn't receive federal funds, so anyone can do whatever they want to you there."

j. His repeated physical encroachment on A.C. in the classroom, including kicking her backpack and brushing against her arm and thigh as he passed her desk; and

218. Defendant Heldreth acted intentionally, or in reckless disregard of the near certainty that severe emotional distress would result. His demands escalated rather than ceased after Plaintiff reported the conduct and A.C. declined to meet him alone. He responded to the reports and her refusals by lowering her grades, physically encroaching upon A.C. in class, and requiring additional or different assignments to be completed than other students.

219. Defendant's conduct caused A.C. severe and serious emotional distress.

220. As a direct and proximate result of Defendant's Intentional Infliction of Emotional Distress alleged in this Count, A.C. has suffered and continues to suffer damages as set forth above.

## RELIEF REQUESTED

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court enter a judgment against Defendants, jointly and severally, in an amount in excess of $75,000.00, together with interest, costs, attorney fees, and all other equitable relief, including but not limited to exemplary and/or punitive damages, that this Honorable Court deems just and proper.

Respectfully submitted,

**FLOOD LAW, PLLC**

/s/ Todd F. Flood

TODD F. FLOOD (P58555)
MICHAEL D. WEAVER (P43985)
155 W. Congress Street, Suite 350
Detroit, MI 48226
(248) 547-1032
tflood@floodlaw.com
mweaver@floodlaw.com
*Attorneys for Plaintiff*

Dated: September 16, 2026

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**EMILY COHEN**, *as Next Friend for*
**A.C.**, *a minor,*

Plaintiff,

Case No.
HON.

v.

**INTERLOCHEN CENTER FOR THE ARTS**,
*a Michigan nonprofit corporation,*
**INTERLOCHEN ARTS GROUP**,
*a Michigan nonprofit corporation,*
*d/b/a Interlochen Arts Academy,*
**DAVID HELDRETH**,
**CAMILLE COLATOSTI**, AND
**KRISTINA NICHOLS**,

Defendants.

---

FLOOD LAW, PLLC
TODD F. FLOOD (P58555)
MICHAEL D. WEAVER (P43985)
*Attorneys for Plaintiff*
155 W. Congress St., Ste. 350
Detroit, MI 48226
PH: (248) 547-1032
tflood@floodlaw.com
mweaver@floodlaw.com

---

**JURY DEMAND**

NOW COMES Plaintiff, EMILY COHEN, *as Next Friend for* A.C., *a minor*, by and through counsel, FLOOD LAW, PLLC, and hereby demands a trial by jury in this matter.

Respectfully submitted,

**FLOOD LAW, PLLC**

/s/ Todd F. Flood
TODD F. FLOOD (P58555)

MICHAEL D. WEAVER (P43985)
155 W. Congress Street, Suite 350
Detroit, MI 48226
(248) 547-1032
tflood@floodlaw.com
mweaver@floodlaw.com
*Attorneys for Plaintiff*

Dated: September 16, 2026